MOORE, Judge.
 

 Jimmy Neil Rhodes (“the husband”) appeals from a judgment of the Walker Circuit Court divorcing him and Barbara Cameron Rhodes (“the wife”) and dividing the parties’ marital property. We affirm the judgment in part and dismiss the appeal in part.
 

 Facts and Procedural History
 

 The parties were married on March 12, 1965. There were two children born of the marriage; both children had reached the age of majority at the time of the divorce proceedings.
 

 According to the wife, the husband had been the breadwinner for the family. The husband testified that he had been drafted into the United States Army and that he had served in the Vietnam War. The wife stated that the parties had been married a little over a year when the husband was drafted. According to the husband, he was in the military for approximately two years. The husband stated that, after his military service, he was diagnosed with post-traumatic stress disorder (“PTSD”), which, he stated, causes him to have extreme depression and anxiety. He stated that he suffers from flashbacks, that he has always been “fidgety” at night, that he gets up and looks out the windows, and that his symptoms have gotten progressively worse as he has aged. According to the husband, at the time of trial, he had been visiting a hospital in Tuscaloosa operated by the United States Department of Veterans Affairs (“VA”) for treatment of his PTSD for the past six or seven years.
 

 The husband testified that he had worked as a miner for approximately 30 years before he retired in 2003. According to the husband, he receives monthly benefits of approximately $1,502, before taxes, from his United Mine Workers of America (“UMWA”) pension plan. The husband stated that he receives monthly benefits of approximately $2,602 from the VA and that he receives approximately $2,000 in Social Security disability benefits each month. The husband further stated that he has a 401 (k) account from his mining employment and that there is approximately $22,000 in that account. The wife, on the other hand, receives $203 monthly from a retirement or disability pension from her employment at Bruno’s, a supermarket chain, and $597 monthly in Social Security disability benefits.
 

 The husband testified that he had had an extramarital affair in late 1979 or early 1980 and that, after he was “saved” in 1989, he had admitted having had that affair to the wife. The wife stated that, before the husband admitted that he had had the affair, she had received two letters in the mail telling her about the affair. According to the husband, he and the wife
 
 *56
 
 resumed their marriage after he admitted having the affair. The husband stated that he had not been unfaithful to the wife on any other occasion. The husband stated that the wife had never admitted to having had an affair but that she had said that she had made mistakes. The wife testified that she had never had an affair but that she had told her daughter that she had because she was tired of her daughter asking whether she had had an affair. The wife also testified that she had told her best friend, Deloris Roberts, that she had had an affair with another man, but the wife stated that she had told Roberts that to make the husband jealous because she believed he had been “fooling around” with Roberts.
 

 The husband testified that the wife had suffered from various ailments for a long time; he stated that she had had back surgery and problems with depression, among other things. The husband further testified that the wife had attempted suicide by an overdose of medication on two occasions and that she had gone to the hospital on both occasions.
 

 The wife testified that she had ruptured a disk in her lower back while she was working for Bruno’s. She had surgery on her back in 1994 as a result of the injury. She also has a bulging disk on the opposite side of her back. She has nerve damage in her left leg, which causes her pain, sometimes so much that she cannot move. The wife also suffers from fibromyalgia and osteoarthritis, which also cause her pain. The wife also had neck surgery in August 2005 for a ruptured disk in her neck; the doctor inserted a metal plate and a piece of artificial bone in her neck during that surgery. As a result of that surgery, the wife still experiences pain down her back, around and between her shoulders, and up the back of her neck and into her head. She stated that it is sometimes hard for her to turn her head from side to side and that she has a hard time picking up change or small items. She also experiences muscle twitching and often loses strength in her arms and hands. The wife also stated that she suffers from severe depression, which began, she said, after she learned about the husband’s affair. At trial, the wife testified that she had been prescribed Lexapro, an antidepressant; Lyrica and Celebrex, anti-inflammatory medications, for treatment of her fibromyalgia and osteoarthritis; Soma, a muscle relaxer, and Percocet, as needed, for her back pain; and Valium. The wife also testified that she was unable to afford the majority of those prescriptions at the time of trial. The wife was 59 years old at the time of the trial and was not, at that time, eligible for Medicare because she was receiving disability benefits.
 

 The husband stated that he stayed outside all the time before he and the wife separated because he could not live under the circumstances existing inside the house. The husband testified that the wife had told him that he was not to speak to their next-door neighbor or her husband anymore because the husband had been speaking to the neighbor at the back fence on occasion and because the neighbor had baked the husband cakes on several occasions. The husband stated that the wife had forbidden him from waving at people on the way to church. The husband further testified that he has an older sister who is mentally retarded, that he and his siblings share the responsibility of taking care of her financially, and that the wife allowed him to contribute only $75 per month for his sister’s care. The wife testified, however, that she never had a problem with his contributing to his sister’s care but that she had a problem with his paying his other sister’s share of the expenses.
 

 
 *57
 
 According to the husband, he and the wife separated shortly before Thanksgiving in 2005, and he was forced out of the marital residence at that time. The husband testified that, on that morning, the wife had questioned him about the tithes that he paid to his church and had limited the amount he could pay to the church. The wife, however, stated that she had not had a problem with the husband tithing to the church but that she had merely asked the husband to write one check per month to the church so that he would not have to find the correct change every Sunday. The husband stated that, after he had returned home from church that day, the wife accused him of waving at the lady that lived next door when he had left the house to go to church and that the wife then began cursing and went into a rage. The husband stated that he was laying in bed at that time and that the wife began beating him on his legs and his face. He stated that he could not remember exactly what happened next, but that he did not recall hitting the wife, and that the wife then retrieved a gun. The husband stated that he reached over the wife’s back and locked onto her arm with one hand and jerked the gun out of her hand with his other hand, that he then hid the gun, and that the wife began screaming and telephoned the police. The husband testified that he. had not intentionally hit the wife during that incident but that she had ended up with a cut on her mouth. According to the husband, he was arrested as a result of that incident but he was later found not guilty of charges arising from that incident.
 

 The wife testified that, on the day of the incident, she had not beaten the husband; rather, she said, he had beaten her before she got loose from him. She admitted that she had been upset because the husband had waved at someone on his way to church and that she had told the husband not to wave at the neighbor because she had seen them talking at the fence and because the neighbor had baked him cakes. She stated that they lived in a small neighborhood and that she had not wanted their neighbors talking about her and the husband’s relationship.
 

 The husband filed a complaint for a divorce and for a restraining order against the wife in the Walker Circuit Court on December 12, 2005. The husband asserted, among other things, that he had not returned to the marital residence since the wife had filed a domestic-violence complaint against him on November IB, 2005. The husband requested, among other things, a divorce, an equitable division of the parties’ real and personal property, and a temporary restraining order prohibiting the wife from “taking actions attempting to secrete, hide, destroy, transfer, sell, or damage the property, both real and personal, of the parties.”
 

 On December 13, 2005, the trial court issued a temporary restraining order, which required the wife to refrain from entering the premises where the husband resided, required the husband to refrain from harassing or committing acts of violence upon the wife, and awarded temporary use of a mobile home owned by the parties to the husband.
 

 The wife filed a motion on January 18, 2006, requesting that she be awarded temporary use and possession of the marital residence, temporary spousal support, and attorneys fees. Also on January 13, 2006, the wife filed an answer and a counterclaim, in which she requested temporary and permanent alimony, possession of the marital residence, attorneys fees, and an equitable division of the parties’ marital property. The trial court entered an order on February 15, 2006, which awarded temporary possession of the marital resi
 
 *58
 
 dence to the wife, required the husband to pay $500 per month to the wife in temporary alimony, required the husband to maintain the payments on the two vehicles that were owned by the parties before he filed his complaint for divorce, and restrained both parties from harassing the other or transferring or disposing of marital assets.
 

 According to the husband, the marital residence was built in late 1978 and 1979, and the monthly payment on the residence, at the time of the trial, was approximately $750. The parties had refinanced the mortgage on the property in 2005 for 10 years. The husband testified that, to his recollection, when he and the wife had refinanced the marital residence, it had appraised for $115,000. Evidence was also presented, however, that the fair market value of the marital residence was $128,800.
 

 The husband stated that he and the wife had put approximately $20,000 from the refinancing of the marital residence into a joint savings account and that that amount was to be used to add a sunroom to the house, but the sunroom was never built. The husband testified that had withdrawn some of that money after it was deposited in the joint savings account, but, he said, he had discussed each of his withdrawals with the wife before he made them. He stated that he withdrew $6,000 to transfer into the parties’ joint checking account to start construction of the sunroom. Both parties testified that the wife had withdrawn approximately $15,000 from the parties’ joint savings account and that she had closed the account on July 11, 2005, without discussing it with the husband; the wife placed those funds in a savings account that she had opened in her own name. She stated that, on December 16, 2005, she moved the money from her new savings account to an account in her name at a different bank, although she knew there was a temporary restraining order in effect ordering her not to do so. The wife testified that she had removed the $15,000 from the parties’ joint savings account because the husband had been using an “ATM” card and she did not know where the money was going and because he had offered to buy the next-door neighbors a washing machine and a dryer and she was trying to take care of the money.
 

 The husband also testified that he and the wife had shared a checking account and that the wife had closed that account as well. The wife admitted that, on November 15, 2005, she withdrew $5,138.39 from the parties’ joint checking account. She stated that she did not remember what she had done with that money. The wife testified that she had closed out the parties’ joint checking account on December 21, 2005. She admitted to having made several withdrawals from the parties’ joint checking account after the entry of the court’s restraining order.
 

 With regard to the wife’s monthly expenses, she testified that the power bill for the marital residence is approximately $200, that the water bill is approximately $15 or $20, that her home telephone bill is $57, that her cellular telephone bill is $29.99, that the bill for the security system is $33, that life-insurance premiums are $30
 
 [1]
 
 that automobile insurance is $88, that costs for groceries and household items are approximately $500 to $600, that costs for gasoline are approximately $30, and that the cable-television bill is $71.42. Finally, with regard to medical payments, the wife testified that she has co-pays for medical insurance of approximately $24 a month and that, at times, she has to pay for injections in her back that are not
 
 *59
 
 covered by insurance, which may cost up to $110; the wife estimated that she receives those injections once or twice a month, five or six months out of the year. The wife also testified that she spends approximately $150-200 per month on clothes.
 

 According to the husband, the wife was driving a 2004 GMC Yukon sport-utility vehicle at the time he left the marital residence. He stated that they had been leasing that vehicle and that the wife had had it for about one year. Before that, according to the husband, the wife had driven a 2002 Chevrolet Tahoe sport-utility vehicle and had driven a GMC Envoy for approximately three or four weeks thereafter, but, he said, the wife did not like the Envoy and had the husband trade the Envoy for the Yukon. The husband testified that each of the vehicle transactions had caused him to lose money. The husband stated that the wife had returned the Yukon to the dealership after the parties had separated and after the entry of the temporary restraining order. The husband also testified that he had signed for the debt on the Yukon and was obligated for that debt. The husband testified further that he had traded-Jn the Yukon and a 2003 GMC truck that he had been driving for a later model truck and that his monthly payments on that truck are $729. The husband stated that he had also purchased a 1998 Oldsmobile automobile with money that he had borrowed in his own name and that he owes a little over $1,000 on that vehicle; he stated that he did not use marital funds to purchase the Oldsmobile. The husband stated that he also had a 1994 Buick Regal automobile.
 

 The wife admitted that she had taken the Yukon to the dealership after she had purchased another vehicle, a 2006 Toyota 4-Runner sport-utility vehicle, and that her payments on that vehicle had been $455 per month. According to the wife, she had had some problems with the 4-Runner, so she had purchased a 2007 Jeep Grand Cherokee, for which she paid $557 a month. The wife stated that she had gotten a bad deal on the Jeep, that she had later returned it to the dealership, that the dealership had sold the vehicle, and that she is responsible for paying them the $1,500 balance owed on the Jeep. At the time of the trial, the wife was driving a 2007 Ford Explorer sport-utility vehicle; her monthly payments on the Explorer are $457.
 

 The husband testified that, at the time of trial, he was living in the mobile home that he had purchased for the parties’ daughter. According to the husband, his monthly payment for the mobile home is $203, and he pays lot rent of $100 each month. The husband testified that the power bill in the mobile home costs him approximately $80 each month. The husband stated that the parties’ daughter and her son live with him in the mobile home.
 

 The husband presented evidence indicating that the wife had violated the temporary restraining order by going to the mobile home and by making harassing telephone calls to him. The husband testified that he had been to the marital residence to take the wife groceries at her request and to check the property because the wife had told him she had been hearing things at night. The wife admitted to having called the husband, to having left numerous messages on his answering machine when he did not answer the telephone, and to having visited the mobile home in which the husband was living. The wife further admitted to having yelled at and having threatened the husband after the first trial date.
 

 The husband stated that the parties’ neighbor had filed an harassment charge against the wife after the parties had sepa
 
 *60
 
 rated. The wife stated that the next-door neighbor had filed the harassment charge against her after the wife had written a card to the neighbor and had placed it in the neighbor’s mailbox. The wife also testified to an incident in which the sheriff had filed an action against her in the probate court, requesting that she be committed to a mental-health institution. The wife stated that she had let her son and his family move into her basement, that the son had smoked “meth” in her basement, and that she had called the sheriffs department to get someone to help her get her son and his family out of her house. The sheriff filed the petition seeking the wife’s commitment in the last week of July 2007; the probate court then ordered that the wife be committed to the behavioral medical unit at Walker Regional Hospital. The wife stated that she remained in the hospital for three weeks and that, while she was in the hospital, it was discovered that she had diabetes.
 

 At the close of the trial, which lasted over the course of several months, the trial court entered a divorce judgment on June 18, 2008, which, among other things, divorced the parties on account of the irretrievable breakdown of the marriage; awarded the marital residence to the wife; required the husband to pay to the wife as alimony in gross the monthly amount due on the existing mortgage on the marital residence until the mortgage is paid in full; awarded the wife 50% of the husband’s UMWA pension benefits; awarded the husband his 401(k) account, the mobile home, and the vehicle in his possession; awarded the wife the vehicles in her possession; required the husband to pay $1,500 per month to the wife as periodic alimony; required the husband to pay for all the medical expenses incurred by the wife before the entry of the divorce judgment; required that the husband pay the COBRA health-insurance premiums for the wife for 36 months and that he be responsible for one-half of her medical expenses not reimbursed by insurance; awarded each party the personal property in his or her possession; ordered that each party be responsible for the debts in his or her own name; required the husband to pay $6,500 of the wife’s attorney fees; and entered a restraining order enjoining both parties from harassing, annoying, or alarming the other.
 

 The husband filed his notice of appeal to this court on July 15, 2008. The husband filed a motion to stay enforcement of the divorce judgment during the pendency of the appeal on that same day. On August 12, 2008, the trial court entered an order granting the husband’s motion with regard to the award of a portion of his UMWA pension benefits and the award of attorneys fees, but it otherwise denied his motion. On September 26, 2008, the husband filed a motion for leave of this court to file a Rule 60(b), Ala. R. Civ. P., motion in the trial court; that motion was granted on October 3, 2008. In his Rule 60(b) motion, the husband sought relief from the divorce judgment based on this court’s decision in
 
 Miller v. Miller,
 
 10 So.3d 570 (Ala.Civ. App.2008), which was issued approximately three months after the divorce judgment was entered. That motion is still pending in the trial court.
 

 Discussion
 

 The husband first argues that the trial court exceeded its discretion in its division of the parties’ marital property in the divorce judgment.
 

 “The trial court is afforded a wide degree of discretion in dividing the marital assets of the parties upon divorce.
 
 Moody v. Moody,
 
 641 So.2d 818 (Ala.Civ.App.1994). The only limitation on that discretion is that the division of property be equitable under the circum
 
 *61
 
 stances of the particular case, and the task of determining what is equitable falls to the trial court.
 
 Ross v. Ross,
 
 447 So.2d 812 (Ala.Civ.App.1984). This court must consider the issues of property division and alimony together when reviewing the decision of the trial court,
 
 Albertson v. Albertson,
 
 678 So.2d 118, 120 (Ala.Civ.App.1995), and, because the facts and circumstances of each divorce case are different, this court must also consider the particular facts and circumstances of the case being reviewed.
 
 Murphy v. Murphy,
 
 624 So.2d 620, 628 (Ala.Civ.App.1993). In making the division, the trial court may consider several factors, including the parties’ respective present and future earning capacities, their age and health, their conduct, the duration of the marriage, and the value and type of marital property.
 
 Lutz v. Lutz,
 
 485 So.2d 1174 (Ala.Civ.App.1986). The property division made by the trial court will not be set aside on appeal absent a palpable abuse of that discretion.
 
 Id.”
 

 Cantrell v. Cantrell,
 
 773 So.2d 487, 489-90 (Ala.Civ.App.2000).
 

 The husband argues that the wife was awarded 100% of the marital property when the values of the property awarded are compared with the liabilities that each party was assigned in the divorce judgment. We do not accept this argument, however. Although the marital residence was the most valuable marital asset and was awarded to the wife, the husband was not divested of all of the marital property by the divorce judgment. Rather, he was awarded the parties’ mobile home, the entirety of his 401 (k) account, and the three automobiles that he was in possession of at the time of the trial, each of which have value.
 

 The husband cites
 
 Robinson v. Robinson,
 
 795 So.2d 729 (Ala.Civ.App.2001),
 
 Stewart v. Stewart,
 
 341 So.2d 490 (Ala.Civ.App.1977), and
 
 Helms v. Helms,
 
 54 Ala.App. 551, 310 So.2d 475 (Ala.Civ.App.1975), in support of his argument that the trial court exceeded its discretion in dividing the parties’ property in the divorce judgment. We conclude, however, that the facts of this case are distinguishable from the facts in each of those cases.
 
 See Stewart,
 
 341 So.2d at 492-93 (holding that “each case must be decided on the basis of its own facts and circumstances” and determining that property division was inequitable based on particular circumstances of that case), and
 
 Robinson,
 
 795 So.2d at 735 (determining that property division was inequitable when husband was left with no assets from which to pay the property settlement ordered to the wife without negating the award to the husband).
 

 In
 
 Helms,
 
 which the husband argues is most closely analogous to the present case, the wife was awarded the marital home and a number of income-producing properties; the husband was awarded certain lots and vacant properties owned by the parties, and the parties were each awarded half of the jointly held bank accounts. 54 Ala.App. at 553, 310 So.2d at 477. This court determined that the award was inequitable because it awarded the wife all the income-producing assets as well as the marital home, while the husband was left without a place to live. 54 Ala.App. at 554, 310 So.2d at 478. This court then allowed the judgment to stand, with the exception of the award of the marital home to the wife, and remanded the case to the trial court with instructions to require a sale of the home and an equal division of the proceeds derived therefrom between the parties.
 
 Id.
 

 In the present case, the husband has not been left without a home, and the wife has not been awarded any income-producing property. The trial court’s award provides
 
 *62
 
 both parties with a home, and the property division is not so grossly disproportionate, as it was in
 
 Helms,
 

 [2]
 

 that it amounts to an abuse of discretion by the trial court.
 

 The wife testified that she incurs at least $1,740.41 of monthly expenses for bills, groceries, and other living expenses (electricity — $200; water — $15; home telephone — $57; cellular telephone — $29.99; security system — $33; life insurance — $30; automobile insurance — $88; groceries and household items — $500; gasoline — $30; cable television — $71.42; medical insurance co-pays — $24; back injections at one per month, six months per year — $55; clothes — $150; car payment — $457). The wife’s income from retirement and Social Security disability benefits amounts to $800 per month. After adding $751 per month from the husband’s pension benefits and $1,500 in periodic alimony, the wife will receive approximately $3,051 in monthly income pursuant to the divorce judgment, and she will be left with approximately $1,310.59 each month after her expenses are deducted.
 

 The husband, on the other hand, receives approximately $6,104 per month from retirement benefits, YA disability benefits, and Social Security disability benefits. After deducting the portion of the husband’s monthly UMWA pension benefits awarded to the wife ($751), $1,500 in periodic alimony, the monthly payment for the mortgage on the marital residence of $750, the husband’s car payment of $729, and rent and electricity for the mobile home of approximately $383 per month, the husband is left with income of approximately $1,991 per month.
 
 [3]
 

 With regard to the assets awarded, the marital residence was the most valuable marital asset. The testimony revealed that the fair market value of the residence was approximately $128,000 and that the house had been refinanced in 2006, leaving a $55,000 mortgage owed on the property. Thus, the wife’s equity in the marital home was not the full amount of its estimated fair market value. The husband, on the other hand, was awarded the mobile home, in which there was also little equity since it was fully financed, and his 401 (k) account, which contained approximately $22,000. Both parties were awarded the vehicles they possessed at the time of trial. There was no testimony revealing the equity in any vehicle, only testimony as to the monthly payments on each vehicle.
 

 Although the husband is correct that the trial court granted the divorce based on the irretrievable breakdown of the parties’ marriage rather than the fault of either party, the court may still consider the conduct of the parties in regard to the cause of the divorce, including the husband’s adulterous behavior.
 
 See Clements v. Clements,
 
 990 So.2d 383, 392 (Ala.Civ.App.2007). The trial court was likewise free to consider the wife’s testimony that the husband’s affair had caused her depression and that her restrictions on the husband’s association with their next-door neighbor was a result of his adulterous behavior as well, despite her apparent con-donation of the same. Moreover, the testimony revealed that the wife suffers from a number of physical and mental disabilities that have affected her mobility and have precluded her from working. Although the wife was awarded the most valuable
 
 *63
 
 marital asset of the parties, the award leaves the parties with comparable monthly incomes, and we cannot say, as a matter of law, that the trial court’s property division amounts to an abuse of discretion. We therefore affirm the trial court’s judgment with regard to the division of the marital property.
 

 The husband next argues that the trial court erred by including the husband’s VA disability benefits in calculating periodic alimony and in dividing the marital property. In support of that argument, the husband cites
 
 Miller v. Miller,
 
 10 So.3d 570, 573 (Ala.Civ.App.2008). The opinion in
 
 Miller
 
 was released on September 5, 2008, approximately three months after the divorce judgment in this case was entered on June 18, 2008. “An appellate court cannot consider arguments raised for the first time on appeal.”
 
 Combs v. Combs,
 
 4 So.3d 1141, 1152 (Ala.Civ.App.2008). Because neither the husband’s argument — that the trial court erred by including the husband’s VA disability benefits in calculating periodic alimony and dividing the marital property— nor the potential application of
 
 Miller
 
 to the present case were presented to or ruled upon by the trial court, we decline to consider that issue on appeal.
 
 [4]
 

 The husband last argues that the trial court erred by not granting the husband’s Rule 60(b) motion seeking relief from the divorce judgment and by failing to conduct a hearing on that motion. The husband’s Rule 60(b) motion was filed on September 26, 2008.
 
 See
 
 Rule 60(b), Ala. R. Civ. P. (“If leave of the appellate court [to file a motion under this subdivision] is obtained, the motion shall be deemed to have been made in the trial court as of the date upon which leave to make the motion was sought in the appellate court.”). The husband asserts that his Rule 60(b) motion was denied by operation of law on December 26, 2008, because the trial court failed to rule on that motion within 90 days. As stated in
 
 Conway v. Housing Authority of Birmingham District,
 
 676 So.2d 344, 345 (Ala.Civ.App.1996), however, the 90-day period for ruling on postjudgment motions announced in Rule 59.1, Ala. R. Civ. P., applies only to motions filed under Rules 50, 52, 55, and 59, and not those filed under Rule 60(b). Thus, because the trial court has not yet expressly ruled on the husband’s Rule 60(b) motion, it is still pending before the trial court and there has been no final order on that motion from which to appeal.
 
 See Conway,
 
 676 So.2d at 345. We therefore dismiss the portion of the husband’s appeal that seeks review of the disposition of his Rule 60(b) motion.
 
 See Baugus v. City of Florence,
 
 968 So.2d 529, 531 (Ala.2007) (“An appeal will not lie from a nonfinal judgment.”).
 

 The wife’s request for the award of an attorney fee on appeal is denied.
 

 AFFIRMED IN PART; APPEAL DISMISSED IN PART.
 

 THOMPSON, P.J., and PITTMAN, BRYAN, and THOMAS, JJ„ concur.
 

 [1]
 

 . The wife testified that she pays $90 quarterly for life insurance, or $30 per month.
 

 [2]
 

 . In
 
 Helms,
 
 the wife was awarded approximately $236,000 in unencumbered real estate, mortgages receivable, and cash, while the husband’s property award amounted to only $30,000. 54 Ala.App. at 553, 310 So.2d at 477.
 

 [3]
 

 . There was no testimony regarding the amount of the husband's other monthly expenses or the cost of COBRA insurance for the wife.
 

 [4]
 

 . Although the husband asserts that the issue was raised in a postjudgment motion to the trial court, that postjudgment motion does not appear in the record on appeal, and we are thus unable to determine whether it properly raised the issue of the consideration of the husband's VA disability benefits in the trial court’s award of alimony and its division of the property. Moreover, as discussed in the next paragraph, the husband’s Rule 60(b) motion raising the issue remains pending in the trial court.